**WESTERMAN LAW CORP**
JEFF S. WESTERMAN (SBN 94559)
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Tel: (310) 698-7880
Fax: (31) 775-9777
jwesterman@jswlegal.com

**LEVI & KORSINSKY LLP**
NICHOLAS I. PORRITT
ADAM M. APTON
101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
nporrit@zlk.com
aapton@zlk.com

*Attorneys for Lead Plaintiff Babulal Parmar and Lead Counsel for Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| LEILAND STEVENS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QUIKSILVER, INC., ANDREW P. MOONEY, and RICHARD SHIELDS,<br><br>Defendants. | Case No. 8:15-cv-00516-JVS (JCGx)<br><br>**CLASS ACTION CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Babulal Parmar ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Class Action Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Quiksilver, Inc. ("Quiksilver" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## **NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all persons and entities who purchased the common stock of Quiksilver during the period June 6, 2014 through March 26, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by the defendants' violations of federal securities laws. This Complaint alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its former top officials.

2. Quiksilver designs, develops, and distributes branded apparel, footwear, accessories, and related products for casual and outdoor activities, including surfing, skateboarding, snowboarding, BMX, motocross, and rally car.

3. Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operation, prospects and performance. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company lacked adequate internal controls over financial reporting; and (2) as a result of the foregoing, the Company's financial statement were materially false and misleading at all relevant times.

4. Through 2014 and into early 2015, Quiksilver focused increasingly on the complete implementation of its new enterprise global-reporting system. Quarter over quarter, the Company's implementation efforts resulted in millions of dollars spent in capital expenditure. Notwithstanding the Company's efforts, the implementation of this reporting system resulted in dramatic losses in gross profits and, ultimately, a material weakness in the Company's controls over financial reporting.

5. On March 4, 2015, the Company announced that it would delay its first quarter earnings report due to its audit committee's investigation of a "revenue cut-off issue."

6. On this news, shares of Quiksilver fell $0.09 per share, or approximately 5% from its previous closing price, to close at $1.90 per share on March 4, 2015.

7. On March 26, 2015, the Company filed an amended Form 10-K for the fiscal year ended October 31, 2014 (the "Amended 2014 10-K"), which revealed that its internal control over financial reporting was not effective as of October 31, 2014.

8. On this news, shares of Quiksilver fell $0.35 per share, or over 15% from its previous closing price to close at $1.90 per share, on March 27, 2015.

9. On March 27, 2015, Quiksilver announced the abrupt removal of its President and Chief Executive Officer ("CEO") Defendant Andrew P. Mooney, effective March 27, 2015 and sudden resignation of its Chief Financial Officer ("CFO") Defendant Richard Shields, effective April 3, 2015.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

11. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, (15 U.S.C. § 78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13. Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## **PARTIES**

15. Lead Plaintiff Babulal Parmar purchased Quiksilver common stock at artificially inflated prices during the Class Period and has been damaged thereby. Lead Plaintiff's transactions in Quiksilver common stock were filed with the Court

as an exhibit to the declaration of Jeff S. Westerman in support of Mr. Parmar's motion for appointment as lead plaintiff dated June 1, 2015 in *Stein v. Quicksilver, Inc.*, *et al.* No. 2:15-cv-02810-JVS-JCG (N.D. Cal.) (Docket No. 19), which was consolidated with the above-captioned matter on June 26, 2015. Lead Plaintiff incorporates by reference his certification, and the information contained therein, into this Complaint as if it were set forth fully below.

16. Defendant Quiksilver is a Delaware corporation with its principal offices located at 15202 Graham Street, Huntington Beach, California. It is one of the world's leading outdoor sports lifestyle companies. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZQK".

17. Defendant Andrew P. Mooney ("Mooney") served as the Company's Chairman and Chief Executive Officer until his removal, effective March 27, 2015.

18. Defendant Richard Shields ("Shields") served as the Company's Chief Financial Officer until his resignation, effective April 3, 2015.

19. The defendants referenced above in ¶¶ 16-17 are sometime referred to herein as the "Individual Defendants".

20. Defendant Quiksilver and the Individual Defendants are referred to herein, collectively, as the "Defendants".

21. The scienter of Mooney, Shields and other employees and agents of the Company are similarly imputed to Quicksilver under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

22. Quiksilver is an outdoor sports lifestyle company, which designs, produces and distributes a diversified mix of branded apparel, footwear, accessories, snowboards, and related products.

23. Quiksilver is comprised of three core brands: *Quiksilver*, *Roxy*, and *DC*. The *Quiksilver* and *Roxy* brands are targeted for surfing and snow-sport audiences while *DC* is popular among BMX, motocross, and snowboarding clientele.

24. The Company sells its products in over 115 countries around the world through wholesale customers, Quiksilver's retail stores, and via e-commerce. Historically, the Company's wholesale distribution channel has been responsible for the majority of the Company's net revenues, followed by retail, and then e-commerce.

25. Quiksilver categorized itself into four operating segments consisting of the Americas, Europe/Middle East/Africa, Asia/Pacific, and Corporate Operations. The Americas consisted of sales primarily from the United States, Canada, Brazil, and Mexico; Europe/Middle East/Africa's sales were primarily from Europe, the United Kingdom, Russia, and South Africa; and Asia/Pacific sales came primarily from Australia, Japan, New Zealand, South Korea, Taiwan, and Indonesia. Quiksilver's Corporate Operations included royalties earned from various licensees.

26. One of Quiksilver's fundamental sales strategies was its retail stores, which the Company descripted as an "important component of our global growth strategy." Quiksilver operated a combination of multi-brand stores featuring the Company's merchandise. In addition to its "core brand stores," Quiksilver operated approximately 150 additional factory outlet stores. In total, Quiksilver operated approximately 680 retail stores, offices, showrooms, and distribution centers.

## B. <u>Quiksilver's SAP Apparel and Footwear Implementation</u>

27. In 2012, Quiksilver implemented a new global enterprise-wide reporting system ("ERP"). Quiksilver's ERP was the Apparel and Footwear

Solution developed by SAP SE, a German multinational software corporation that makes enterprise software to manage business operations and customer relations.

28. The implementation and integration of Quiksilver's ERP created a number of problems for the Company. During the quarter ended April 30, 2012, Quiksilver expanded the implementation of the ERP to the Company's Americas region. At that time, Quiksilver advised investors that "[m]anagement [was] reviewing and evaluating the design of key controls in SAP and the accuracy of the data conversion that [was] taking place during its implementation . . . ." Quiksilver warned further that, "[a]lthough management believe[d] internal controls [would] be maintained or enhanced by SAP, it ha[d] not completed its testing of the operating effectiveness of all key controls in the new system." Quiksilver Form 10-K, June 11, 2012, p. 38.

29. The following quarter, Quiksilver informed investors that it had begin implementation of the ERP within the Company's European segment. Quiksilver advised that it was continuing to "review[] and evaluat[e] the design of key controls in SAP and the accuracy of the data conversion that [was] taking place during its implementation . . . ." Quiksilver Form 10-Q, September 10, 2012, p. 37.

30. In January 2013, Quiksilver informed investors that the Company had spent $66 million in capital expenditures during fiscal 2012, a portion of which was spent on implementing SAP. Quiksilver Form 10-K, January 10, 2013, p. 30.

31. On June 7, 2013, Quiksilver filed its quarterly report (Form 10-Q) for the quarter ended April 30, 2013 with the SEC. In the report, Quiksilver stated that "[d]uring the quarter ended April 30, 2013, [the Company] expanded the implementation of [the ERP] system in our EMEA segment." Quiksilver Form 10-Q, June 7, 2013, p. 44. Quiksilver stated further that "[m]anagement [was]

reviewing and evaluating the design of key controls in SAP and the accuracy of the data conversion that [was] taking place during its implementation . . . ." *Id.*

32. In the same vein, Quiksilver revealed that the implementation of the SAP was partially responsible for its significant decrease in gross profits (*i.e.*, $211 million down from $242 million year-over-year). Quiksilver stated that "[t]he gross margin decrease was primarily due to four factors: a) increased discounting and clearance sales of our DC brand within our wholesale channel to clear slow-selling product, primarily in the Americas segment; *b) increased discounting in our EMEA segment across all three core brands associated with shipping delays encountered with our implementation of SAP*; c) $3 million of additional inventory reserves recorded related to certain non-core brands and peripheral product categories that were discontinued; and d) a net revenue mix shift from the higher gross margin EMEA segment toward the lower gross margin Americas segment." *Id.* at 34 (emphasis added). Quiksilver assured investors that "the SAP issues experienced within the EMEA segment and the additional inventory reserves recorded are expected to be isolated within the second quarter." *Id.* Quiksilver stated further that "[t]he $28 million decline in net revenue in EMEA during the first half of fiscal 2013 was driven by three primary factors: a) approximately $16 million was attributable to unanticipated shipping delays associated with our implementation of SAP that resulted in canceled orders from wholesale accounts; b) poor weather that impacted key markets; and c) continuing economic difficulties in the region." *Id.* at 36.

## C. <u>Management Is Responsible for Financial Reporting</u>

33. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB Accounting Standards Codification ("ASC") which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶ 1.)

34. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

35. Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial

> statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).)

36. Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . ." (15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

37. Quiksilver's management, including the Company's CEO and CFO, conducted evaluations of the effectiveness of Quiksilver's internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements. Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

38. By requiring Defendants to make the "Sarbanes-Oxley Certifications"

in question, Congress and the SEC sought "to facilitate full disclosure and ensure the accuracy of financial reports by requiring corporate executives' personal stamp of approval." 149 Cong. Rec. S5325, S5329-30 (daily ed. Apr. 11, 2003) ("It is our intent that courts impose a duty on these individuals to be reasonably informed of the material facts necessary to prepare financial information for submission to the SEC and for dissemination to the public.").

### D. Materially False and Misleading Statement Issued During the Period

*June 6, 2014*

39. On June 6, 2014, the first day of the Class Period, the Company filed a Form 10-Q for the quarterly period ended April 30, 2014 (the "2Q14 Form 10-Q") with the SEC, which provided the Company's quarterly financial results position and stated the Company's internal control over financial reporting was effective as of April 30, 2014. In pertinent part, the 2Q14 Form 10-Q stated that, "[b]ased on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, and were operating at the reasonable assurance level as of April 30, 2014." 2Q14 Form 10-Q at 42. The 2Q14 Form 10-Q was signed by Defendant Shields.

40. The 2Q14 Form 10-Q also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mooney and Shields, which stated in pertinent part that they: "reviewed this quarterly report on Form 10-Q of Quiksilver, Inc."; that the "report [did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of

the registrant as of, and for, the periods presented in this report"; that they were "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant"; that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant"; that they "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; that they "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation"; that they "[d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting"; and that they "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . . All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and . . . Any fraud, whether

or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." 2Q14 Form 10-Q, Exhibits 31.1 and 31.2.

41. In addition, while Quiksilver discussed the implementation of the ERP system, it omitted to state material facts. Quiksilver stated as follows:

> ***Difficulties in implementing our new global Enterprise Resource Planning system and other technologies could impact our ability to design, produce and ship our products on a timely basis.***
>
> We are in the process of implementing the SAP Apparel and Footwear Solution in addition to certain peripheral technologies as our core operational and financial system (together, "ERP"). The ongoing implementation of the ERP is a key part of our continuing efforts to manage our business more effectively by eliminating redundancies and enhancing our overall cost structure and margin performance. Difficulties in implementing SAP and integrating peripheral technologies to this new ERP could impact our ability to design, produce and ship our products on a timely basis, and thereby have an adverse effect on our business, financial condition and results of operations.

2Q14 Form 10-Q at 49.

42. The above statements in ¶¶ 39-41 were materially false and misleading because the Quiksilver in fact had a material weakness within its internal control over financial reporting. In February 2015, Quiksilver's management revealed to the Company's Board of Directors that the ERP system was not being used properly. The Board of Directors commenced an internal investigation, which resulted in the finding that shipment routing and customer delivery information was not being consistently maintained in the Company's ERP system in accordance with the Company's procedures. Further, the investigation revealed that employees had been violating the Company's Code of Business Conduct and Ethics in connection

with the acts and omissions that gave rise to the Board of Director's conclusions.

*September 8, 2014*

43. On September 8, 2014, the Company filed a Form 10-Q for the quarterly period ended July 31, 2014 (the "3Q14 Form 10-Q") with the SEC, which provided the Company's quarterly financial results position and stated the Company's internal control over financial reporting was effective as of July 31, 2014. In pertinent part, the 3Q14 Form 10-Q stated that, "[b]ased on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, and were operating at the reasonable assurance level as of July 31, 2014." 3Q14 Form 10-Q at 43. The 3Q14 Form 10-Q was signed by Defendant Shields.

44. The 3Q14 Form 10-Q also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mooney and Shields, which stated in pertinent part that they: "reviewed this quarterly report on Form 10-Q of Quiksilver, Inc."; that the "report [did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; that they were "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant"; that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant"; that they "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; that they "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation"; that they "[d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting"; and that they "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . . All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and . . . Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." 3Q14 Form 10-Q, Exhibits 31.1 and 31.2.

45. In addition, while Quiksilver discussed the implementation of the ERP system, it omitted to state material facts. Quiksilver stated as follows:

> ***Difficulties in implementing our new global Enterprise Resource Planning system and other technologies could impact our ability to design, produce and ship our products on a timely basis.***
>
> We are in the process of implementing the SAP Apparel and Footwear Solution in addition to certain peripheral technologies as our core operational and financial system (together, "ERP"). The ongoing implementation of the ERP is a key part of our continuing efforts to manage our business more effectively by eliminating redundancies and enhancing our overall cost structure and margin performance. Difficulties in implementing SAP and integrating peripheral technologies to this new ERP could impact our ability to design, produce and ship our products on a timely basis, and thereby have an adverse effect on our business, financial condition and results of operations.

3Q14 Form 10-Q at 50.

46. The above statements in ¶¶ 43-45 were materially false and misleading because the Quiksilver in fact had a material weakness within its internal control over financial reporting. In February 2015, Quiksilver's management revealed to the Company's Board of Directors that the ERP system was not being used properly. The Board of Directors commenced an internal investigation, which resulted in the finding that shipment routing and customer delivery information was not being consistently maintained in the Company's ERP system in accordance with the Company's procedures. Further, the investigation revealed that employees had been violating the Company's Code of Business Conduct and Ethics in connection with the acts and omissions that gave rise to the Board of Director's conclusions.

*December 23, 2014*

47. Quiksilver filed its annual report (Form 10-K) for the fiscal year ended October 31, 2014 with the SEC on December 23, 2014 (the "2014 Form 10-K"), which provided the Company's yearly financial results and stated the Company's internal control over financial reporting was effective as of October 31, 2014. In

pertinent part, the 2014 Form 10-K stated that, "[b]ased on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, and were operating at the reasonable assurance level as of October 31, 2014." 2014 Form 10-K at 41. The 2014 Form 10-K was signed by Defendant Shields and Mooney (as well as Quiksilver's then-current directors).

48. The 2014 Form 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mooney and Shields, which stated in pertinent part that they: "reviewed this quarterly report on Form 10-Q of Quiksilver, Inc."; that the "report [did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; that they were "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant"; that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant"; that they "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; that they "[e]valuated the effectiveness

of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation"; that they "[d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting"; and that they "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . . All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and . . . Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." 2014 Form 10-K, Exhibits 31.1 and 31.2.

49. In addition, while Quiksilver discussed the implementation of the ERP system, it omitted to state material facts. Quiksilver stated as follows:

> ***Difficulties in implementing our new global Enterprise Resource Planning system and other technologies could impact our ability to design, produce and ship our products on a timely basis.***
>
> We are in the process of implementing the SAP Apparel and Footwear Solution in addition to certain peripheral technologies as our core operational and financial system (together, "ERP"). The ongoing implementation of the ERP is a key part of our continuing efforts to manage our business more effectively by eliminating redundancies and enhancing our overall cost structure and margin performance.

> Difficulties in implementing SAP and integrating peripheral technologies to this new ERP could impact our ability to design, produce and ship our products on a timely basis, and thereby have an adverse effect on our business, financial condition and results of operations.

2014 Form 10-K at 11.

50. The above statements in ¶¶ 47-49 were materially false and misleading because the Quiksilver in fact had a material weakness within its internal control over financial reporting. In February 2015, Quiksilver's management revealed to the Company's Board of Directors that the ERP system was not being used properly. The Board of Directors commenced an internal investigation, which resulted in the finding that shipment routing and customer delivery information was not being consistently maintained in the Company's ERP system in accordance with the Company's procedures. Further, the investigation revealed that employees had been violating the Company's Code of Business Conduct and Ethics in connection with the acts and omissions that gave rise to the Board of Director's conclusions.

51. The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational, and compliance policies, which were known to, or recklessly disregarded by, Defendants. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company lacked adequate internal controls over financial reporting; and (2) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

## E. The Truth Begins to Emerge

*March 4, 2015*

52. On March 4, 2015, the Company issued a press release announcing the delay in the release of its financial results for the first quarter of 2015 due to

management's identification of a revenue cut-off issue. The press release states in part:

> ***Quiksilver, Inc. (ZQK) today announced that it has postponed the distribution of its 2015 first quarter earnings release, as well as the related conference call and webcast previously scheduled to take place on March 5th, as a result of a revenue cut-off issue identified by management and brought to the attention of the Audit Committee***.
>
> The Audit Committee promptly commenced an investigation last week and has not yet reached any conclusions. Based on currently available information, the Company believes that the completion of the Audit Committee's investigation will have no material impact on its previously issued financial statements, its 2015 first quarter financial results, or its current guidance.
>
> The Audit Committee plans to review progress regarding its investigation at a previously scheduled regular meeting of the Board of Directors on March 16th, after which the Company anticipates announcing a date for distribution of its first quarter 2015 financial results during March.

(Emphasis added.)

53. On this news, shares of Quiksilver fell $0.09 per share or approximately 5% from its previous closing price to close at $1.90 per share on March 4, 2015.

*March 17, 2015*

54. During an investor conference call held March 17, 2015, to discuss the Company's earnings report for the first quarter of fiscal year to 2015 (the "1Q15 Conference Call"), Mooney began by addressing the postponed first quarter earnings reports. Mooney stated:

> We appreciate your patience with regard to the delay in reporting in our Q1 financial results. As we previously announced the release of our first quarter financial results postponed from March 5th due to an investigation for revenue cutoff issue. ***In late February management***

> ***discovered a deficiency in our internal controls related to quarter-end revenue cutoff, whereby accurate information regarding shipment loading and customer delivery was not consistently maintained in our ERP system in accordance with company procedures.***

(Emphasis added.)

*March 26, 2015*

55. On March 26, 2015, the Company filed an amended Form 10-K for the fiscal year ended October 2014 (the "Amended 2014 10-K" with the SEC. The Amended 10-K revealed that its internal control over financial reporting was not effective as of October 31, 2014—contrary to what was previously reported in the 2014 10-K. The Amended 2014 10-K stated in part:

> **Item 9A. Controls and Procedures**
>
> (a) Evaluation of Disclosure Controls and Procedures We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act that are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide a reasonable level of assurance of reaching our desired disclosure control objectives.
>
> We carried out an evaluation under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and

operation of our disclosure controls and procedures as of October 31, 2014, the end of the period covered by this report. ***Previously, based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of October 31, 2014. However, due to the material weakness in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure procedures were not effective, and were not operating at the reasonable assurance level as of October 31, 2014.***

(b) Management's Annual Report on Internal Control Over Financial Reporting (Revised)

Internal control over financial reporting refers to the process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and disposition of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the consolidated financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations. Internal control over financial reporting is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. Internal control over financial reporting also can be circumvented by collusion or improper management override. Because of such limitations, there is a risk that material misstatements may not be prevented or detected on a timely basis by internal control over financial reporting. However, these inherent limitations are known features of the financial reporting process. Therefore, it is possible to design into the process safeguards to reduce, though not eliminate, this risk. Management is responsible for establishing and maintaining adequate internal control over our financial reporting.

Management has used the framework set forth in the report entitled "Internal Control—Integrated Framework" published by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission (1992 Framework) to evaluate the effectiveness of its internal control over financial reporting.

***Management had previously reported that its internal control over financial reporting was effective as of October 31, 2014; however, in February 2015, management identified and brought to the attention of the Audit Committee a revenue cut-off issue.*** The Audit Committee promptly commenced an investigation, with the assistance of independent legal counsel and outside forensic accountants, engaged by the Audit Committee (the "Independent Investigation"), into the scope and causes of this revenue cut-off issue and reported the results of the Independent Investigation to the full Board of Directors and management.

***Based on the results of the Independent Investigation and our reassessment of the deficiencies in the operating effectiveness of certain of our internal controls, we have determined that a material weakness existed in our internal control over financial reporting as of October 31, 2014.*** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim consolidated financial statements will

> not be prevented or detected on a timely basis. ***Management has identified deficiencies in operating effectiveness that, in combination, represent a material weakness in internal control over financial reporting as follows:***
>
> > ***In our North America wholesale operations, accurate information regarding actual shipment routing and customer delivery was not consistently maintained in our ERP system in accordance with our procedures. As a result, certain net revenues recorded in the prior period did not meet the criteria for revenue recognition at that time but instead should have been recognized in the following quarter. In addition, certain of our employees took actions inconsistent with our Code of Business Conduct and Ethics. These deficiencies in combination represented a material weakness in our internal control over financial reporting.***
> >
> > ***Because of the material weakness identified, management has concluded that its internal control over financial reporting was not effective as of October 31, 2014.***
>
> We analyzed the impact of the revenue cut-off misstatements from the identified material weakness and concluded that it did not have a material impact on our previously issued consolidated financial statements. Notwithstanding the material weakness in our internal control over financial reporting, we have concluded that the consolidated financial statements and other financial information included in the Original Filing, fairly present in all material respects our financial condition, results of operations and cash flows as of, and for, the periods presented.
>
> The foregoing has been approved by our management, including our Chief Executive Officer and Chief Financial Officer, who have been involved with the reassessment and analysis of our internal control over financial reporting.
>
> Deloitte & Touche LLP has issued an attestation report (see below) on our internal control over financial reporting.

(Emphasis added).

56. The market reacted sharply to this news. On March 26, 2015, Quiksilver stock closed at $2.25 per share. As the market absorbed Quiksilver's disclosure the following day, the Company's stock price dropped precipitously. On March 27, 2015, Quiksilver stock closed at $1.90 per share. In total, Quiksilver stock declined by $0.35 per share, or over 15%.

**F. <u>Defendants Acted With Scienter</u>**

57. Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Defendants Mooney and Shields caused Quiksilver to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.

58. Defendants repeatedly represented to investors that the Company's internal controls were adequate and that Defendants Mooney and Shields were complying with their obligations under SOX. Defendants made these representations notwithstanding the fact that implementation of the ERP had been problematic from the very beginning and had cost the company millions of dollars in capital expenditures.

59. Furthermore, according to one of Quiksilver's former Corporate Financial Planning & Analyst employees ("Former Employee 1"), Mooney was well aware of the deficiencies within the ERP. Former Employee 1 reported to Patrick Finnigan (current Vice President of Finance at Quiksilver) and worked for the Company between August 2012 and November 2014. In this capacity, Former Employee 1 was responsible for assisting with operating and capital planning and forecasting.

60. Former Employee 1 recalled that the financial reporting and revenue recognition problems stemmed from Quiksilver's ERP system. Former Employee 1 said that SAP SE was hired for about $40 million to construct a financial reporting system. Former Employee 1 continued that the implementation of the ERP system into Europe and Asia occurred under Mooney's term at Quiksilver. Former Employee 1 said that only two people at Quiksilver knew how to consolidate and work the system given the multiple languages, currencies and consolidation processes.

61. Former Employee 1 explained that one of the specific challenges in the ERP system revolved around journal entries being inaccurate. Former Employee 1 explained that the ERP system was complex, and that the two individuals who understood the SAP system were based in California. Former Employee 1 said, "When only one person knows [the system] it's hard to get the job done. He was there for 10 years until getting in trouble with the SEC." When asked if Defendant Mooney was aware of the issues with the ERP system, Former Employee 1 replied, "Yes." Former Employee 1 explained that the ERP system issues were discussed during regular meetings.

62. In February 2015, the Board of Directors was made aware of the fact that Quiksilver employees were not properly recording shipment routing and customer delivery information into the ERP system. This prompted an investigation which led to the conclusion that the Company's internal controls over financial reporting were deficient and that employees had been taking actions "inconsistent with [the Company's] Code of Business Conduct and Ethics." However, Defendant Mooney had been aware of the problems with the ERP since before 2015.

63. On March 27, 2015, the very next day after the Board of Directors' conclusion, the Company announced the removal of Defendant Mooney, effective

that day and the sudden resignation of Defendant Shields, effective April 3, 2015. In a press release dated March 27, 2015 (which Quiksilver filed with the SEC as an exhibit to a current report (Form 8-K) on April 1, 2015), Quiksilver stated that "Pierre Agnes, President of Quiksilver, Inc., has been promoted to Chief Executive Officer and added to the Board of Directors; he succeeds Andy Mooney who is no longer with the company." Quiksilver's Form 8-K stated that, "On March 26, 2015, the board of directors (the "Board") of Quiksilver, Inc. (the "Company"), removed Andy Mooney as the Company's Chairman and Chief Executive Officer, effective March 27, 2015. The Company expects to enter into an agreement with Mr. Mooney prior to the end of its second fiscal quarter regarding his departure from the Company. Also on March 26, 2015, Richard Shields, the Company's Chief Financial Officer, resigned from that position, effective April 3, 2015, to pursue other opportunities."

64. Quiksilver's separation agreement with Defendant Mooney called for the termination of all of Mooney's responsibilities and obligations to the Company effective immediately as of March 26, 2015. While the Company agreed to pay Mooney additional wages, the Company cancelled Mooney's health coverage and over half of his restricted stock units without payment of any consideration from the Company.

65. On June 9, 2015, following the replacement of Defendants Mooney and Shields, the Company's new CEO held a conference call (the "2Q15 Conference Call"). Company CEO Pierre Agnes, Global President and President of the Americas Greg Healy, CFO Thomas Chambolle, and Investor Relations Joe Teklits attended the call on behalf of Quiksilver. During the 2Q15 Conference Call, Company officials made further corrective disclosures regarding the Company's previous guidance and internal controls over financial reporting. After describing

his strategy for the Company's future, Pierre Agnes concluded his remarks to investors by stating:

> Now for the areas where we still need to improve. As you can see from our press release, we do not expect to achieve the previously stated guidance for the year. Currency and execution issues, primarily in North America, where much of the improvement was expected to come from on the back end of the year, is putting pressure on our full year EBITDA outlook. While we plan to improve our EBITDA from last year, on a constant currency basis, we are falling well short of our goals. ***Implemented structural changes have not yet brought the expected results. This is largely due to poor execution, which is impacting our on-time deliveries.*** We are fixing this as we speak and we are confident the profit improvement will happen. We will give you further details later in the call and Greg will speak specifically about the opportunities we see in North America in a few minutes. We are all well aware of the challenges ahead, but the strength of the Team that we have, and the ability that I see to improve execution, is giving me confidence to develop the future of our brands.
>
> Priority number one, people: People are one of the keys to our business. I am both impressed and excited by the passion and commitment shown by the current team in North America. ***Having said that, we feel that there has been a lack of leadership and expertise in key roles in the US, and that needed to be addressed immediately.*** To that end, I have appointed Andrew Bruenjes as the CFO of the Americas. Andrew and I have successfully worked together in APAC for many years and he brings with him a tremendous understanding of our business and strong financial acumen. I'm also delighted to announce that Ted Li will be shortly joining our Company as our Head of Sales in the Americas. Ted comes to us from Oakley, where he worked for the last 17 years in sales leadership roles, most recently as Vice President of North America. We are delighted to have him join the Team. In addition, we will continue to look to add talent to augment the existing Team accordingly.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

66. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all

persons who purchased or acquired Quiksilver securities during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, securities of Quiksilver were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Quiksilver or their transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

68. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the misstatements and omissions alleged herein were made with scienter;

(c) Whether the statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations and management of Quiksilver;

(d) Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) Whether the prices of Quiksilver securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

(f) To what extent the members of the Class have sustained damages, and the proper measure of damages.

71. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all member is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

72. At all relevant times, the market for Quiksilver securities was an efficient market for the following reasons, among others:

(a) Quiksilver securities met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Quiksilver communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Quiksilver was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Quiksilver was reflected in and incorporated into the Company's stock price during the Class Period.

73. As a result of the foregoing, the market for Quiksilver securities promptly digested current information regarding Quiksilver from all publicly available sources and reflected such information in Quiksilver's stock price. Under these circumstances, all purchasers of Quiksilver securities during the Class Period suffered similar injury through their purchase of Quiksilver securities at artificially inflated prices, and a presumption of reliance applies.

74. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## **NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

75. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and

omissions alleged in this Complaint.

76. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

77. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Quiksilver who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT I

(*Violation of Section 10(b) and Rule 10b-5 Against All Defendants*)

78. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase

Quiksilver's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

80. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Quiksilver's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

81. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Quiksilver as specified herein.

82. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Quiksilver's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Quiksilver and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business that operated as a fraud and deceit upon the purchasers of Quiksilver's securities during the Class Period.

83. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

84. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Quiksilver's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

85. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Quiksilver's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Quiksilver's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Quiksilver's securities during the Class Period at artificially high prices and were or will be damaged thereby.

86. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Quiksilver's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Quiksilver's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

87. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

88. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection

with their respective purchases and sales of the Company's securities during the Class Period.

89. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

(*Violation of Section 20(a) Against Mooney and Shields*)

90. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

91. Mooney and Shields acted as controlling persons of Quicksilver within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Mooney and Shields had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Mooney and Shields were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

92. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93. As set forth above, Quiksilver, Mooney, and Shields each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

94. By virtue of their positions as controlling persons, Mooney and Shields are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

95. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 25, 2015

Respectfully submitted,

**LEVI & KORSINSKY LLP**

Adam M. Apton (*pro hac vice*)
Nicholas I. Porritt (*pro hac vice to be submitted*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: aapton@zlk.com
Email: nporritt@zlk.com

WESTERMAN LAW CORP.
Jeff S. Westerman (SBN 94559)
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Tel: (310) 698-7880
Fax: (650) 775-9777
Email: jwesterman@jswlegal.com

*Attorneys for Lead Plaintiff Babulal Parmar and Lead Counsel for Class*

4824-2542-6727, v. 1

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1900 Avenue of the Stars, 11th Floor, Los Angeles, California 90067.

On August 25, 2015, I served the following document:

CLASS ACTION CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

By posting this document to the ECF Website of the United States District Court for the Central District of California, for receipt electronically.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 25, 2015, at Los Angeles, California.

/s/Jenna Radomile

Jenna Radomile